UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY ANN THOMPSON,

     *Plaintiff,*

*v.*                        CASE NO. 11-CV-12034

COMMISSIONER OF             DISTRICT JUDGE JOHN CORBETT O'MEARA
SOCIAL SECURITY,           MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

     In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

     Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability and Disability

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Insurance Benefits ("DIB"), and for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 8, 11.)

Plaintiff was 44 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 36, 137, 142.) Plaintiff's employment history includes work as a cashier, taxi driver, housekeeper, machinist, and food preparation worker. (Tr. at 177.) Plaintiff filed the instant claims on May 31, 2007, alleging that she became unable to work on December 18, 2006. (Tr. at 137, 142.) The claims were denied at the initial administrative stages. (Tr. at 93, 94.) In denying Plaintiff's claims, the Commissioner considered affective disorders, osteoarthritis and allied disorders as possible bases for disability. (*Id.*) On October 2, 2009, Plaintiff appeared before Administrative Law Judge ("ALJ") Truett M. Honeycutt, who considered the application for benefits *de novo*. (Tr. at 17-29.) In a decision dated January 11, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 28-29.) Plaintiff requested a review of this decision on March 9, 2010, and April 22, 2010. (Tr. at 12-16.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on March 16, 2011, when, after the review of additional exhibits[2] (Tr. at 216-26, 460-95), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-7.) On May 10, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.    Standard of Review

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d

at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record,

4

regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

## C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

   **D.     ALJ Findings**

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had met the insured status requirements through September 30, 2011, and had not engaged in substantial gainful activity since December 18, 2006, the alleged onset date. (Tr. at 22.) At step two, the ALJ found that Plaintiff's chronic pain syndrome, migraine headaches, scoliosis, obstructive sleep apnea, irritable bowel syndrome, affective disorder and anxiety disorder were "severe" within the meaning of the second sequential step. (Tr. at 22.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 22-23.) At step four, the ALJ found that Plaintiff could perform her past relevant work as a light cashier and light housekeeper/cleaner. (Tr. at 28.) Alternatively, at step five, the ALJ found that Plaintiff retains the residual functional capacity to perform a limited range of light work. (Tr. at 23-27.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 28.)

### E.   Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff has had chronic pain since an automobile accident in 1996 and that her pain was exacerbated by an accident in December 2006. (Tr. at 236.) Plaintiff stated that the 1996 accident "may have been a suicide attempt but she was very foggy with regard to memory." (Tr. at 249.) "She was drinking alcohol at the time and received a drunk-driving ticket." (*Id.*)

On August 14, 2005, Plaintiff sought treatment in the emergency room for right groin pain. (Tr. at 227, 278.) All test results were normal, and Plaintiff was released with Motrin and Vicodin prescriptions as needed. (Tr. at 228, 279.)

On February 16, 2007, Plaintiff sought treatment in the University of Michigan Family Practice Clinic for back and knee pain and was examined by Dr. Tara Master. (Tr. at 233-35.) It

was noted that Plaintiff "was working at Polly's until December where she was doing lots of lifting. She then worked at Little Caesar's for 2 weeks, but quit because of her back problems." (Tr. at 233.) It was also noted that Plaintiff was "having a lot of anxiety over her daughter's ex-boyfriend trespassing on their land." (Tr. at 233.) She reported that he continued to come to their house even though her daughter had a restraining order against him, and that she was afraid that he was "going to try and steal the baby as he did 1 time in the past." (*Id.*) It was also noted that in the past "she took Zoloft, Klonopin, and Desyrel for her depression and anxiety," but that she had been "off these medications for a long time now." (*Id.*) Plaintiff's strength in her upper and lower extremities was 5/5 and she had a "normal gait." (Tr. at 234.) Dr. Master prescribed Paxil and ordered blood work and x-rays of Plaintiff's back. (*Id.*)

On February 26, 2007, Plaintiff was examined by Dr. Eric Skye at the same clinic where it was noted that Plaintiff "did not take the Paxil as prescribed because her daughter reminded her that she had taken it before and did not have a good reaction to it." (Tr. at 236.) Plaintiff's prescription was changed to Prozac and she was prescribed Trazadone to help her sleep. (*Id.*)

On March 11, 2007, Plaintiff sought treatment in the emergency room for a headache. (Tr. at 229, 280.) After an otherwise normal examination and a determination that Plaintiff was having headaches consistent with those she had experienced in the past, Plaintiff was discharged home with a prescription for Vicodin. (Tr. at 230, 281.)

On March 21, 2007, Plaintiff was examined at the University of Michigan Spine Program by Suehun Ho, M.D. (Tr. at 231-32, 282-83.) Dr. Ho noted that Plaintiff's films taken on March 12, 2007, revealed "slight scoliosis," "[m]ultilevel degenerative disk and joint disease" with "[a]nterior osteophytes" and joint disease "worse at L4-L5 and L5-S1," although "[d]isk heights [were] relatively preserved except decreased at L1-L2." (Tr. at 231, 282.) Dr. Ho found Plaintiff's

8

bilateral lower extremity strength to be 5/5. (Tr. at 232, 283.) Dr. Ho recommended that Plaintiff "may benefit from being on an anti-depressant," that she should "start an aerobic exercise program to help with pain and mobility," that she "may benefit from scheduled anti-inflammatory medications," and may want to "consider bilateral sacroiliac joint injections in the future, however will hold off at this time so see how she responds to the medication." (*Id.*)

On May 29, 2007, Plaintiff sought treatment for insomnia and was examined by Andrea Breese in the clinic. It was noted that although Plaintiff had been referred to orthopedics for her knee pain, Plaintiff had not gone to this appointment. (Tr. at 240.) In addition, it was noted that a "friend of hers gave her a Percocet pill and that took away her pain, so she would like to switch to Percocet." (Tr. at 240.) Dr. Breese informed Plaintiff that her pain regimen would not be changed until she saw orthopedics as instructed. (*Id.*) As an addendum, it was noted that Plaintiff's "urine was negative for Vicodin which raises questions of what she is doing with the narcotic we are giving her. Will have to terminate her narcotic agreement." (*Id.*)

On June 1, 2007, Plaintiff was referred to and examined by Creg Carpenter, M.D., who discussed with Plaintiff the fact that she had "very early degenerative changes in her knees but that her findings are most consistent with anterior knee pain." (Tr. at 244.) Dr. Carpenter noted that he "certainly would not recommend narcotic pain medication for this problem." (*Id.*) He further "recommended that she take a light anti-inflammatory medicine such as Aleve or Motrin for this problem." (*Id.*)

Plaintiff underwent a Mental Status Evaluation on July 14, 2007, by Thomas S. Rosenbaum, Ph.D. (Tr. at 245-50.) Plaintiff indicated that she wanted "to work with children and move to Florida where her first husband lives" and that "she and her first husband have been talking to one another on the telephone for three years now." (Tr. at 247.) Plaintiff also stated that she was "very

9

involved with raising her grandson" and that he "has been her 'savior.'" (Tr. at 248.) Plaintiff reported that she smoked marijuana "once in a while." (Tr. at 249.) Dr. Rosenbaum assessed that Plaintiff was "at times illogical," had a "volatile temper," and perceived herself as a victim. (*Id.*) Dr. Rosenbaum also found Plaintiff "quite dramatic in her presentation." (*Id.*) As an example, he noted that Plaintiff stated that "when she gets up in the morning she is so sore that she literally has to 'crawl to the bathroom.'" (*Id.*) Dr. Rosenbaum diagnosed Bipolar I Disorder, mixed, Cognitive Disorder due to head trauma, alcohol abuse, marijuana abuse, and personality disorder with mixed borderline and histrionic features, a GAF score of 55, and a guarded prognosis. (Tr. at 250.)

On July 31, 2007, Plaintiff was referred to the University of Michigan's Rheumatology Clinic where she underwent an examination. (Tr. at 287-89.) The report noted that fourteen of fifteen "systems were reviewed" and all were "negative except as stated above in history of present illness." (Tr. at 287.) Although a "[r]ecent urine toxicology screen was positive for marijuana use," Plaintiff "[d]enie[d] any active drug abuse at this point." (Tr. at 288.) It was noted that Plaintiff's "xrays of knees and lumbar spine [were] suggestive of osteoarthritis," but that her "history and clinical exam [were] not suggestive of any acute inflammatory process." (*Id.*) However, since she was being seen for the first time, the clinic decided "to confirm by obtaining an ESR, CRP, rheumatoid factor and antinuclear antibody." (Tr. at 288.)

A Psychiatric Review Technique completed on August 1, 2007, determined that Plaintiff had organic mental disorders (Cognitive Disorder due to head trauma), affective disorders (Bipolar I Disorder, Mixed), and substance abuse disorders (alcohol abuse and cannabis abuse). (Tr. at 252, 253, 255, 260.) Plaintiff was found to be moderately limited in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. at 262.) However, it was also noted that there was "no history of inpatient psychiatric hospitalization" and,

10

although Plaintiff reported a history of special education, there were "[n]o problems with understanding, concentration, talking, or answering [] noted during the teleclaim interview." (Tr. at 264.)

A Mental Residual Functional Capacity ("RFC") Assessment completed on August 1, 2007, by Blaine Pinaire, Ph.D., concluded that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods, but was otherwise not significantly limited in understanding and memory or sustained concentration and persistence. (Tr. at 266-67.) Dr. Pinaire also determined that Plaintiff was moderately limited in her ability to interact appropriately with the general public, to get along with coworkers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting, but was otherwise not significantly limited in social interaction or adaptation. (Tr. at 267.) The assessment concluded that despite these limitations, Plaintiff was "capable of unskilled work." (Tr. at 268.)

A Physical RFC Assessment completed on August 2, 2007, concluded that Plaintiff retained the capacity to lift 50 pounds occasionally and 25 pounds frequently, to stand or walk about 6 hours in an 8-hour workday, to sit about 6 hours in an 8-hour workday, and that she was unlimited in her ability to push or pull. (Tr. at 271.) There were no postural, manipulative, visual, communicative, or environmental limitations found. (Tr. at 272-74.)

On January 7, 2008, an ultrasound of Plaintiff's bilateral shoulders showed "[m]ild thickening of the subacromial subdeltoid bursa" and "[d]egenerative changes of the

acromioclavicular joint and the visualized portions of the superior posterior glenoid labrum" of the left shoulder and "[m]ild focal subacromial subdeltoid bursal thickening" and "[a]cromioclavicular degenerative changes" of the right shoulder. (Tr. at 423.)

On March 5, 2008, Dr. Robert Ike and Farhan Tahir of the University of Michigan Rheumatology Clinic noted that Plaintiff's "extensive workup" showed no acute inflammatory process or immunological concerns. (Tr. at 290.) Prescription medications were continued and Plaintiff was encouraged to be "active and maintain her activities." (Tr. at 292.) Upon examination, they found that all Plaintiff's joints had normal range of motion and that there was "no active synovitis." (Tr. at 294.) Plaintiff's "rheumatoid factor, nuclear antibodies, and CPC" were also negative and her "ESR and CRP" were also "within normal limits." (*Id.*) Prescription medicines were continued and Plaintiff was again encouraged to be active and maintain her activities. (*Id.*)

Plaintiff underwent right trigger finger release surgery on July 1, 2008. (Tr. at 376.) On May 4, 2009, Plaintiff was "completely asymptomatic" and was discharged from Dr. B.J. Page's care. (Tr. at 392.)

On September 23, 2008, Kathryn Dietz, M.D., suggested Plaintiff "follow up with the fibromyalgia group that she has been referred to" although Dr. Dietz also noted that she was "not really sure [Plaintiff] the  has this diagnosis as she does have discrete areas of identifiable causes of pain, nonetheless she is maintained on Lyrica 100 mg bid at this time." (Tr. at 297.)

On October 1, 2008, Dr. Page evaluated Plaintiff and diagnosed impingement syndrome and degenerative joint disease of the bilateral shoulders. (Tr. at 408.) Dr. Page also noted that Plaintiff had "full ROM of bilateral shoulders, elbows, wrists and finger without subluxation or dislocation of these joints." (Tr. at 407.)

Plaintiff underwent carpal tunnel release surgery on October 7, 2008. (Tr. at 374-75.)

On October 15, 2008, MRIs of Plaintiff's right shoulder showed "supraspinatus tendinosis with tiny area of partial thickness intrasubstance tear in distal anterior aspect of this tendon," "[m]ild acromioclavicular arthropathy and mild to moderate lateral acromial down sloping," and "[m]ild subacromial/subdeltoid bursitis." (Tr. at 371.)

On October 31, 2008, Plaintiff reported that she was "doing terribly" and had gone to the emergency room earlier in the week for "wrist pain related to her recent carpal tunnel surgery." (Tr. at 300.) Plaintiff reported that "she was told by the ER doc there that she couldn't keep coming to the ER for pain control." (*Id.*)

On November 23, 2008, Plaintiff was treated for a possible renal stone and her "prescription use was discussed at length." (Tr. at 303.) Plaintiff was "informed that the dictated note would be present for the family practice physicians to see to note that she had received the Norco starter pack." (*Id.*) She was discharged in stable condition. (*Id.*)

On January 6, 2009, Plaintiff reported to Dr. Dietz that "injections helped [her] knee pain briefly" but that "the pain of getting the injections wasn't worth it" and she didn't want to get any more. (Tr. at 305.) Dr. Dietz noted that the spine clinic concluded that Plaintiff didn't have "spinal etiology of pain" and that Plaintiff was taking Lyrica. (Tr. at 306.) Dr. Dietz "[e]ncouraged exercise as tolerated[.]" (Tr. at 307.)

On January 13, 2009, Plaintiff was evaluated by Dr. Mark Pinto for her shoulder pain and he recommended "conservative care" including physical therapy and icing. (Tr. at 399.)

On January 20, 2009, Plaintiff was referred to the University of Michigan Sleep Disorders Clinic where she was examined and diagnosed. (Tr. at 308-11.) Plaintiff reported that her symptoms were under "poor control" as she was "no longer on pain medications . . . because she had violated her pain contract through her primary care doctor." (Tr. at 308.) She stated that "[i]n

13

the past, she had good control of her fibromyalgia symptoms when she was on pain medications in addition to aquatic therapy." (Tr. at 308-09.) Plaintiff indicated that she "resorts to marijuana use when possible as she feels it helps alleviate her pain, improves her sleep, as well as her nausea symptoms." (Tr. at 309.) Plaintiff was assessed with "[i]nsomnia with sleep apnea" and it was recommended that she undergo sleep apnea studies before any pharmacologic treatment would be recommended. (Tr. at 310.)

On January 22, 2009, Plaintiff underwent an upper GI endoscopy due to reported epigastric abdominal pain. (Tr. at 315.) The test revealed "a small hiatus hernia" and "esophageal mucosal changes suspicious for short-segment Barrett's esophagus," so biospies were taken. (*Id.*) The biopsies showed normal tissue. (Tr. at 320.) The stomach and duodenum were normal. (Tr. at 315.)

On January 28, 2009, Plaintiff was evaluated by Ross Halpern, Ph.D., of the Back and Pain Center. (Tr. at 317-19.) Dr. Halpern noted that Plaintiff "was irritated regarding her medical treatment and her lack of being prescribed narcotics readily." (Tr. at 317.) It was noted that "[s]ymptomatic patterns suggest she tends to magnify minor physical dysfunction into great problems and easily becomes quite anxious." (Tr. at 318.) Plaintiff "still smokes marijuana to help her sleep and eat." (Tr. at 319.) Dr. Halpern stated that Plaintiff was "looking to become dependent on the system, i.e., the government to take care of her and dependent on narcotics to sedate her from trauma." (*Id.*) He diagnosed Plaintiff at Axis I with 307.89 (pain disorder associated with both psychological factors and a general medical condition) with a GAF score of 52. (Tr. at 318.)

On January 29, 2009, Plaintiff was referred to the Urology Center at Domino's Farms for an evaluation due to "microscopic hematuria and urge incontinence." (Tr. at 323.) There were "no significant findings" on Plaintiff's renal protocol CAT scan. (Tr. at 324.)

On January 30, 2009, Dr. Carpenter had a long discussion with Plaintiff about her knees and discussed the possibilities of "visco supplementation," which Plaintiff "did not wish to pursue," and "glucosamine," which Plaintiff stated she would try. (Tr. at 397.) Dr. Carpenter indicated that he "would not like to see her go this route" of "narcotic pain medication," but if she "refuses other treatment, this may be necessary." (*Id.*)

On February 24, 2009, Plaintiff was evaluated by John Arnedt, Ph.D., and Scott Pickett, Ph.D., in the Behavioral Sleep Medicine Clinic. (Tr. at 326-29.) It was noted that her "sleep-onset problems began about 7 to 8 months ago when her primary care physician made the medical decision to discontinue the use of pain medication due to the patient violating a contract with her PCP." (Tr. at 326.) Although Plaintiff appeared "somewhat angry," her "thought content was focused and was logical, coherent, and goal directed," her "[j]udgment and insight appeared to be good," and all "higher cognitive functions appear[ed] to be intact." (Tr. at 328.) Plaintiff was diagnosed with insomnia due to medical condition, specifically chronic pain at Axis I, and was assessed a GAF score of 65. (*Id.*) Since pain medication was not an option, it was suggested that she participate in a few sessions of cognitive behavioral therapy to correct her sleep "hygiene problems," but Plaintiff "was not overly motivated to engage in this treatment." (*Id.*)

On March 12, 2009, Plaintiff sought treatment in the Adult Ambulatory Psychiatry Department. (Tr. at 330-32.) Plaintiff's Cymbalta prescription dosage was increased and Plaintiff was spoken to regarding her "previously broken narcotic contract with her previous PCP." (Tr. at 331.)

On March 30, 2009, Plaintiff was evaluated by Dr. Fouad Reda, to whom Plaintiff reported that she "continues to suffer from chronic pain and she is still not prescribed any 'good pain killers.'" (Tr. at 333.) Dr. Reda noted that Plaintiff was scheduled for "an appointment with a new

primary care physician mid-April and she is hoping that she is going to be prescribed 'Suboxone' to better help her pain." (Tr. at 333.) It was further noted that Plaintiff presented with "low mood, easy irritability, anhedonia, sleep disturbance, and decreased concentration in the context of her ongoing stressors." (*Id.*) "The patient continues to abuse marijuana, which is very likely contributing to some of her current symptoms." (Tr. at 334.) In addition, it was noted that Plaintiff is "[n]ot very compliant with her antidepressant medications namely SNRI, which in turn might explain the lack of efficacy of the medication." (*Id.*) "[P]sychotherapeutic intervention aiming at teaching her some coping skills to better adjust to the ongoing stress" was recommended. (*Id.*) Dr. Reda diagnosed Mood Disorder, NOS. (*Id.*)

On April 6, 2009, Plaintiff underwent a cytoscopy which "demonstrated no evidence of any bladder tumor, stones, or diverticula." (Tr. at 335, 337-38.) In addition, the urine cytology was "[n]egative for neoplasm." (Tr. at 335.)

Plaintiff began treating with Daniel Berland, M.D., on April 14, 2009, who noted that Plaintiff was "seeking a new physician after having been told that Dr. Dietz could no longer prescribe opioids for her after contract violations." (Tr. at 339.) Dr. Berland examined Plaintiff and reviewed "[m]ultiple x-rays of the knees, spine, and sacroiliac joints [that] were not diagnostic of significant disease other than some degenerative changes." (Tr. at 340.) Dr. Berland "emphasized to her that non-pain medicine regimens utilizing psychotherapy and adjuvent therapy will be the mainstay of her treatment" and that he would "not be prescribing her any controlled substances." (*Id.*) Dr. Berland also "recommended she see the movie 'Ordinary People' as an example of the kind of therapy that she needs to undergo." (*Id.*)

On April 16, 2009, a bladder scan was performed to obtain "postvoid residual volume." (Tr. at 342.) Dr. Masahito Jimbo prescribed medication for Plaintiff's "dysfunctional voiding of the bladder with retention." (Tr. at 343.)

On April 17, 2009, Plaintiff was examined by Dr. Dietz who made prescription medication changes and recommended physical therapy, counseling, smoking cessation and exercise. (Tr. at 347.)

On April 21, 2009, Plaintiff participated in a sleep study wherein "[a]ll CPAP settings effectively treated the patient's sleep disordered breathing; however, the sleep was more fragmented at CPAP settings higher than 4 cm of water." (Tr. at 433.)

On May 11, 2009, Plaintiff reported to Dr. Reda that she was "very stressed from seeing her new primary care physician, Dr. Berland" because he did not give her any "pain killers." (Tr. at 349.) Dr. Reda noted that Plaintiff was "angry" and "perseverative on the idea that she is in pain." (*Id.*) Plaintiff's prescription medications were adjusted and Dr. Reda diagnosed Mood Disorder, NOS, with an additional note to "rule out substance-induced mood disorder[.]" (Tr. at 350.)

Plaintiff participated in individual psychotherapy on May 12, 2009, and June 10, 2009, (Tr. at 351, 361.)

On June 8, 2009, Plaintiff was evaluated by Dr. Humphrey Atiemo of the Department of Urology Surgery who noted that Plaintiff had "stress incontinence on exam" that was "not consistent with her past urodynamic evaluation." (Tr. at 357.) Dr. Atiemo stated that he planned to "teach her ISC today" and have her "keep a bladder diary to better record her bladder function." (Tr. at 357.)

On July 27, 2009, Plaintiff sought treatment with Dr. Rodney Dewyer who noted that "stress is a huge portion of her issue." (Tr. at 366.)

On August 11, 2009, Plaintiff was treated by Dr. Reda, who noted that Plaintiff terminated her individual psychotherapy sessions, stating "'this is me and I feel I ain't gona [sic] change.'" (Tr. at 367.) Plaintiff indicated that she had a social security hearing coming up soon and hoped she would "'win,' which will solve her financial problems." (Tr. at 367.)

On August 13, 2009, Plaintiff received Supartz injections to her bilateral knees. (Tr. at 370.)

On August 19, 2009, Plaintiff was examined by Dr. Mary Ann McKee of the Department of Neurology for migraine headaches. Dr. McKee concluded that the headaches were "influenced in their frequency by the degree of stress that she is under as well as her use of caffeine." (Tr. at 429.) Dr. McKee indicated that she counseled Plaintiff to "try to taper the amount of caffeine in the diet Pepsi by switching to the caffeine free version over time." (*Id.*) Dr. McKee also prescribed Depakote as a preventive medication and Amerge as an abortive agent. (*Id.*) An MRI of Plaintiff's brain revealed "punctate and patchy areas of high T2 and FLAIR signal and bilateral cerebral white matter" for which the "diagnostic possibilities include migraine related signal change, sequela of previous trauma, demyelination or infection." (Tr. at 431.) The test also showed a "[n]ormal MRA of he head" and "[n]ormal MRV of the brain." (*Id.*)

A Medical Assessment of Ability to Do Work-related Activities (Mental) was completed by Dr. Reda on November 30, 2009. (Tr. at 446-48.) Dr. Reda opined that Plaintiff's ability to relate to co-workers, deal with the public, and function independently was fair, but that her ability to follow work rules, use judgment, interact with supervisors, deal with work stress, and maintain attention/concentration was poor. (Tr. at 446.) Dr. Reda explained that Plaintiff "suffers from severe emotional instability fueled by multiple stressors (financial, familial and health related

18

stress)." (*Id.*) Dr. Reda also found Plaintiff's ability to understand, remember and carry out detailed or complex job instructions was poor and that her ability to understand, remember and carry out simple job instructions was fair. (Tr. at 448.) Dr. Reda stated that Plaintiff's ability to maintain personal appearance and relate predictably in social situations was fair and that her ability to behave in an emotionally stable manner and demonstrate reliability was poor. (*Id.*)

Dr. Dietz completed a Medical Assessment of Ability to Do Work-related Activities (Physical) on December 1, 2009, where she concluded that Plaintiff was able to occasionally lift up to 10 pounds and never carry anything of higher weight, was able to sit for 4 hours and stand or walk for 1 hour during an 8-hour workday due to her knee osteoarthritis and "SI joint DJD and lumbar spurring," could occasionally grasp or manipulate with either hand based on her history of carpal tunnel syndrome, and could never perform any postural activities except for occasionally stooping due to her migraines and knee osteoarthritis. (Tr. at 449-50.) Dr. Dietz further found that Plaintiff could never push or pull, could occasionally reach, and could frequently handle, feel, hear, and speak due to her "shoulder abn., hx of carpal tunnel[,] [and] DJD/knee OA." (Tr. at 451.) The doctor also found that Plaintiff was restricted by all listed environmental limitations based on her COPD and migraines, but the doctor did not provide a corresponding number indicating the amount of avoidance needed, e.g, concentrated, moderate, or all exposure. (Tr. at 452.)

In her daily activity report, Plaintiff indicated that on a typical day she would make breakfast for herself and her grandson, do dishes, work with her grandson to help him with his ABCs and shapes, go outside for about thirty minutes, water the plants, watch her grandson play for around one hour, watch cartoons with her grandson, make lunch, work more with her grandson, make dinner, have a bath, and then go to bed. (Tr. at 186.) Plaintiff also indicated that she cannot stand or sit for longer than twenty to thirty minutes at a time. (Tr. at 187.) Plaintiff stated that on

19

her own she could cook, clean, do dishes and do laundry, but that she received help with lifting heavy items and yard work. (Tr. at 188.) Plaintiff indicated that she was able to drive a car, ride in a car, shop in stores for about twenty minutes at a time, and handle her own personal finances in the same manner she was before her illness began. (Tr. at 189-90.)

Plaintiff testified at the administrative hearing that she was unable to work on bad days due to "depression, the pain, the fatigue," and that she had between eight and ten bad days per month. (Tr. at 48.) She further testified that her pain was "[a]ll over the body." (*Id.*) When the ALJ asked Plaintiff how many city blocks she could walk before having to stop, she stated, "one." (Tr. at 49-50.) However, when the ALJ asked her how long she could stand and walk around inside a store like Wal-Mart, she responded, "[m]aybe 20 minutes." (Tr. at 50.) When asked how much time she could stand during an eight-hour period, she stated, "[m]aybe two hours." (*Id.*) Plaintiff further testified that she could sit for "[m]aybe 20, 30 minutes" before she would need to stand. (*Id.*) Plaintiff indicated that she was able to care for her personal grooming, but that she spent "zero" time doing chores and never washed clothes or dishes. (Tr. at 51.) However, Plaintiff testified that she "might help cook dinner with my daughter," that she could grocery shop for fifteen to twenty minutes and that she was able to drive to the store. (Tr. at 51-52.)

When asked whether she had "ever had a problem with either alcohol or street drugs interfering with [her] life," Plaintiff responded, "No." (Tr. at 53.) However, when further asked whether she had ever "had a ticket for DWI, public intoxication, [or] driving while under the influence," Plaintiff responded, "Yes." (*Id.*) Upon further questioning, she explained that she had received two tickets for driving while intoxicated. (*Id.*) Plaintiff added that she had stopped drinking four years prior to the hearing, that she suffered from migraine headaches two or three times a month, and that her medication helped "sometimes" but that she also tried to sleep for three

to four hours. (Tr. at 54, 56-57.) Plaintiff stated that she does not sleep well due to sleep apnea and her need to go to the bathroom frequently. (Tr. at 57.) Plaintiff also stated that she experienced panic attacks three or four times a month that last between thirty minutes and a few hours. (Tr. at 57-58.) Plaintiff testified that when she gets depressed, she stays in her room all day and that she does this for seven or eight days out of the month. (Tr. at 61-62.)

When the first medical expert, Dr. Howard McClure, was asked why there was no history of carpal tunnel issues or limitations after recovery from release surgeries, Plaintiff's counsel explained that Plaintiff was "discharged [] as a contract violation in the use of narcotics for that clinic" because the clinic "did a urine screen and were surprised to see that it was positive for marijuana but it was negative for Vicodin, which they had been giving her in fairly large quantities," and that this raised "suspicion that she might be selling her Vicodin or obviously she wasn't taking it regularly." (Tr. at 69.) Dr. McClure also clarified that although Dr. Dietz mentioned fibromyalgia once, he "didn't see that specifically diagnosed" and "there was really no attempt in the material that I saw to elicit the tender points required for a specific diagnosis." (Tr. at 70.) Dr. McClure stated that "chronic pain syndrome is, I think, what is not specific organic documentation as to the cause is, is considered in the profession to be more psychiatric" than physical. (Tr. at 83.) Dr. McClure opined that Plaintiff's testimony was not supported by objective medical evidence. (Tr. at 73-74.)

The second medical expert, Dr. Alvin Smith, testified that the severe mental impairment established in this case was affective disorders, i.e., mood disorder, NOS, anxiety disorder, NOS, and marijuana abuse. (Tr. at 74-75.) Dr. Smith stated that he

> didn't see any clear or discrete periods where the record indicates that she's not using marijuana. All I have, Your Honor, is her treating source comments such as marijuana use likely contributes to her symptoms and marijuana abuse is

compounding the clinical picture. And there's a rule out diagnosis of substance
induced mood disorder.

(Tr. at 75-76.) Dr. Smith concluded that Plaintiff's difficulties with daily living and with her ability

to maintain concentration, persistence or pace was "moderate." (Tr. at 76.) Dr. Smith also agreed

with the mental RFC's conclusion that Plaintiff was capable of simple, repetitive, unskilled work.

(Tr. at 77, 79.) Finally, Dr. Smith testified that the degree of depression established in this case

would not support a need to stay isolated in a room all day. (Tr. at 89.)

The ALJ asked the Vocational Expert ("VE") to assume a person with Plaintiff's

background with the "physical limitations by Dr. McClure and the mental limits by Dr. Smith."

(Tr. at 80.) The VE testified that such a person would be able to perform Plaintiff's past work as

a light cleaner or housekeeper and cashier II. (*Id.*) In addition, the VE confirmed that such a person

could perform "substantially the full range of light, unskilled work." (Tr. at 80-81.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ concluded that Plaintiff was capable of returning to her prior work as a light

cashier and light housekeeper or cleaner. The Commissioner's regulations state that the agency

"will first compare our assessment of your residual functional capacity with the physical and

mental demands of your past relevant work." 20 C.F.R. § 416.960(b); 20 C.F.R. §404.1560(b). "If

you can still do this kind of work, we will find that you are not disabled." 20 C.F.R. § 404.1520(f);

20 C.F.R. § 404.1560(b)(3). "'By referring to the claimant's ability to perform a "kind" of work,

[the regulations] concentrate[] on the claimant's capacity to perform a type of activity rather than

[her] ability to return to a specific job or to find one exactly like it.'" *Boucher v. Apfel*, 2000 WL

1769520, at *7 (6th Cir. Nov. 15, 2000) (quoting *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir.

1995)).

An "ALJ [is] not required to solicit testimony from a VE in reaching his conclusion" that a plaintiff is able to perform her past relevant work. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010) (citing 20 C.F.R. § 404.1560(b)(2) ("We *may* use the service of vocational experts . . . to help us determine whether you can do your past relevant work[.]") (emphasis in original); *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007) ("The regulations permit an ALJ to use the services of a vocational expert at step four to determine whether a claimant can do his past relevant work . . . .")). Should the ALJ use the services of a VE, the ALJ need only incorporate those limitations into the hypothetical question that he finds credible and supported by the record. *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

As noted earlier, the ALJ determined in the alternative that during the time Plaintiff qualified for benefits, she retained the residual functional capacity to perform a limited range of light work. (Tr. at 23-27.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

**2.    Substantial Evidence**

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ's credibility findings are not supported by substantial evidence. (Doc. 8 at 10-11.) Citing *Easter v. Bowen*, 867 F.2d 1128, 1130-31 (8th Cir. 1989), Plaintiff contends that since she has been diagnosed with a somatoform disorder, the ALJ could not reject her subjective complaints of pain simply because they were not supported by objective medical evidence, because a somatoform disorder causes a claimant to exaggerate her physical problems in her mind. Plaintiff then cites Dr. Halpern as having "specifically referenced somatoform disorder in his assessment (Tr. 318)." (Doc. 8 at 10-11.) However, Dr. Halpern did not mention somataform disorder on page 318 of the transcript. In the testimony recorded on that page, Dr. Halpern diagnosed Plaintiff at Axis I with "307.89," which, according to the DSM-IV, is not a somatoform disorder but rather is pain disorder associated with both psychological factors and a general medical condition. Further, I suggest that *Easter* is inapposite. In *Easter*, the ALJ rejected the VE's testimony that the claimant was incapable of any work, ignored the claimant's substantiated somatoform disorder, and rejected the claimant's testimony "[w]ithout expressly finding Mrs. Easter's testimony not credible." *Easter*, 867 F.2d at 1131. Here, the VE did not find Plaintiff incapable of any work (but rather found she could return to prior work), Plaintiff was not diagnosed with a somatoform disorder, and the ALJ expressly found Plaintiff less than credible. (Tr. at 26.) I also note that the ALJ specifically acknowledged that Plaintiff's allegations of

disabling pain "may not be rejected solely due to the lack of objective medical evidence, which fully corroborates the alleged severity of the pain." (*Id.*)

The more salient issue is whether the ALJ's finding that Plaintiff was less than fully credible is supported by substantial evidence. When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).

Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645, at *3 (6th Cir. Feb. 11, 1999) (unpublished). However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such

25

severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms.

Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.* Although a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence," S.S.R. 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

(i)    [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)  Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)  Any measures . . . used to relieve . . . pain.

*Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); S.S.R. 96-7p, at *3. Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20 C.F.R. § 404.1527(c); S.S.R. 96-7p, at *5.

In this case, the ALJ considered the appropriate factors and found that Plaintiff's complaints of disabling pain were not fully credible. (Tr. at 26-27.) After examining the record evidence, I suggest that substantial evidence supports the ALJ's finding. The ALJ specifically acknowledged that Plaintiff's allegations of disabling pain "may not be rejected solely due to the lack of objective medical evidence, which fully corroborates the alleged severity of the pain." (Tr. at 26.) The ALJ therefore considered Plaintiff's medical history, the fact that both medical experts at the administrative hearing (Drs. McClure and Smith) opined less than disabling limitations and the ability to do simple unskilled work, inconsistencies in Plaintiff's allegations (such as her ability to do personal care and grocery shop but not to do household chores and her reported ability to stand/walk for two hours), continued substance abuse, record of noncompliance with treatment, and exaggerated complaints. (Tr. at 26-27.)

I further suggest that the evidence of record more than adequately supports the ALJ's credibility determination. Plaintiff was a frequent visitor to emergency rooms and clinics for minor problems that each time resulted in a quick release home. (Tr. at 227-28, 229-30, 240, 278-79, 280-81, 300.) In addition, despite her claims of inability to use her extremities, Plaintiff's strength in her upper and lower extremities was consistently 5 out of 5. (Tr. at 232, 234, 283, 407.) Much of Plaintiff's anxiety and stress was related to family situations and choices made by Plaintiff and her loved ones. (Tr. at 232, 366, 429, 446.)

In addition, Plaintiff failed to take medications as prescribed (Tr. at 233, 236, 334) and failed to take advantage of recommended referrals and treatments. (Tr. at 240, 305, 367, 397.)

This behavior is inconsistent with disability. *See Strong v. Soc. Sec. Admin.*, 85 Fed. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain."); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) (affirming ALJ's credibility finding where the "claimant chose to forego drug therapy due to the possible side effects").

Instead, Plaintiff consistently smoked marijuana despite warnings that it would adversely affect her health. (Tr. at 249, 288, 309-10, 319, 334.) In addition, the medical record describes what I can only characterize as Plaintiff's relentless pursuit of narcotic pain killers (Tr. at 240, 300, 308-09, 317, 326, 333, 349), coupled with repeated refusals by Plaintiff's treating physicians to prescribe narcotics for her. (Tr. at 244, 303, 310, 340.) The medical records also testify to the fact that Plaintiff's treating physicians were sufficiently concerned about her use of narcotics that they prepared "contracts" to govern her use of these medications – agreements that they felt forced to terminate when questions arose as to what Plaintiff was doing with the medication. (Tr. at 240, 326, 331.) These facts alone undermine Plaintiff's credibility. *See Poppa v. Astrue*, 569 F.3d 1167, 1172 (10th Cir. 2009) ("there is sufficient evidence in the record to support the ALJ's determination that Ms. Poppa's credibility about her pain and limitations was compromised by her drug-seeking behavior"); *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (where claimant smoked two packs of cigarettes per day and was at least 40 pounds overweight despite doctor's warnings, ALJ's finding that plaintiff's complaints of disabling pain were not fully credible was supported by substantial evidence).[3]

---

[3]The Court noted:

The Social Security Act did not repeal the principle of individual responsibility. Each of us faces

The ALJ's credibility determination is also consistent with the opinions of treating, examining, and assessing doctors who themselves found Plaintiff less than fully credible. (Tr. at 73-74, 89, 249, 288, 318.) Furthermore, Plaintiff's testimony was inconsistent with respect to her use of alcohol. When first asked whether alcohol or street drugs had ever interfered with her life, Plaintiff responded in the negative. (Tr. at 53.) However, when further asked whether she had ever received a ticket for any type of alcohol-related offense, Plaintiff admitted that she had twice been ticketed for driving while intoxicated. (*Id.*)

Finally, as noted by the ALJ, Plaintiff's own description of her activities and abilities is inconsistent with total disability. In her daily activity report, Plaintiff indicated that on a typical day she makes breakfast for herself and her grandson, does the dishes, works with her grandson to help him with his ABC's and shapes, goes outside with him for about 30 minutes, waters her plants, watches him play, watches cartoons with him, makes lunch, works more with him, makes dinner, bathes him, and puts him to bed. (Tr. at 186.) Plaintiff stated that she is able to cook, clean, do dishes and laundry, drive a car, ride in a car, shop in stores for about twenty minutes at a time, and that she is able to handle her own personal finances in the same manner she was before her illness began. (Tr. at 50, 188-90.) I therefore suggest the ALJ's credibility findings are supported by substantial evidence. *See Monateri v. Comm'r of Soc. Sec.*, 436 Fed. App'x 434, 445-46 (6th Cir. 2011) (substantial evidence supported ALJ's credibility finding where the plaintiff's impairments did not require acute inpatient or acute outpatient care, daily activities included meal

---

myriads of choices in life, and the choices we make, whether we like it or not, have consequences. If the claimant in this case chooses to drive himself to an early grave, that is his privilege – but if he is not truly disabled, he has no right to require those who pay social security taxes to help underwrite the cost of his ride.

*Sias*, 861 F.2d at 480.

preparation and housework, social interactions included family and a boyfriend, and where there was improvement when the plaintiff was substance-abuse free).

To the extent that Plaintiff argues that the ALJ should not have considered Plaintiff's substance abuse or noncompliance when determining Plaintiff's level of credibility, I suggest that the ALJ did not err. As to non-compliance, the social security rulings provide that

> [a]n individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability.

S.S.R. 82-59. The ruling also provides examples of justifiable cause, including the inability to afford treatment and a lack of free community resources. *Id.* I note that any requisite procedures under S.S.R. 82-59 only apply after an ALJ finds that the claimant would otherwise be disabled. In the instant case, "[b]ecause the ALJ concluded that [Plaintiff] was not disabled, SSR 82-59 is inapplicable." *Lockwood v. Comm'r Soc. Sec. Admin.*, 397 Fed. App'x 288, 290 (9th Cir. 2010). I therefore suggest that the ALJ did not err in considering Plaintiff's non-compliance with recommended treatment when assessing her credibility.

As to substance abuse, the regulations similarly provide that an ALJ must first determine whether a claimant suffers from a disability before proceeding, if needed, to a determination of whether the substance abuse is a "contributing factor to the determination of a disability." 20 C.F.R. § 416.935. Although substance abuse issues "should not be considered in the determination of disability unless and until the claimant is found to be disabled without considering them, 20 C.F.R. §§ 404.1535(a) and 416.935(a), the regulations do not prevent them from properly being considered for other purposes . . . [such as] a determination of his credibility." *Stroud v. Comm'r of Soc. Sec.*, No. 10-12515, 2011 WL 4576387, at *4 (E.D. Mich. Sept. 30, 2011). I therefore

suggest that the ALJ did not err when he considered Plaintiff's substance abuse as part of his credibility determination.

### 3.  Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.


## III.  <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗

CHARLES E. BINDER
Dated: March 15, 2012                     United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  March 15, 2012              By____s/Patricia T. Morris_____
                                        Law Clerk to Magistrate Judge Binder